All rise. Please be seated. The next case call for order of argument is in the matter of Mary H. Good morning. May please support counsel. I represent Dr. Mary H. Regarding this appeal of the involuntary medication order. Basically, there's three issues that I addressed on the brief, whether the state presented clear and convincing evidence with regard to the issue of capacity. First of all, whether the state proved that it provided written information about alternative forms of treatment. The second one was whether the doctor provided sufficient clear and convincing evidence about the lack of capacity. And then the third argument we present is whether the behavior satisfies any of the three criteria, suffering, threatening behavior, or deterioration of ability of function. Preliminary, the issue, you know, these orders expire within 90 days. Usually we have to raise the issue of mootness, but both sides agree that this appeal satisfies both the public interest and the collateral consequences, exceptions to mootness. So now the first issue with regarding to the capacity is whether the state proved that it provided written information about alternative forms of treatment. That's well settled. I addressed that in my reply brief, but Section 52102A5 states that the doctor or the service provider has to provide information about treatment as well as alternatives to treatment. And then earlier in the code, Section 51128 defines treatment as care, training, and psychotherapy. So it really doesn't say if the state's interpretation is information about alternatives to alternatives, pharmaceuticals is sufficient. But if you look at the code, and it's also reaffirmed by court cases in the first, second, and fourth district, that alternative information has to be provided to the respondent. And that provokes full information to the respondent so they know why actually the hospitals now provide information why counseling doesn't work or why medication would be the better one versus other forms of treatment. And just to let you know, we had a string of cases with this, but now the state's attorneys, at least where I practice, do offer this element as proof. So they've corrected their error. With regard to the issue of capacity, which I think is a very interesting one in this case because, you know, she was a licensed doctor and practiced. So when the psychiatrist issued the issue of capacity, she said, oh, Dr. M is not in touch with the reality due to her psychosis. She can't be reasoned with. She cannot understand. And then later on, the doctor stated that the doctor clarified if she doesn't believe it's a false fixation ideation, a delusion, then she doesn't believe she needs medication. So it's really those are kind of simplistic answers that courts in Nicholas L and in other cases have kind of rejected with regard to the issue of capacity, especially the issue of basically the doctor's later clarifying that because she has delusions, she lacks capacity. Now, delusions can be, of course, a factor in this. I have clients who have delusions that medication is the government's poisoning me, medications are horrible, you know, off the wall thing. Her delusions were not in telling with regarding the medication. It was her belief that she was a crime victim. So, you know, and in Israel, they said delusions, you know, they found that he had capacity even though he had delusions. And I would not like to embrace the kind of state's argument that just because you have delusions, you lack the capacity to make a decision. I think that broadens it too broad and then you have substantive due process issues. Basically, she testified that, you know, she read. Of course, she was – Israel has six factors. I don't have time to go through this. But she was there involuntarily. We met that. But she was aware that she had a choice. She gave detailed information. She actually read about the side effects. She understood about the side effects. She gave a history of the reactions that she had. And she gave her perceived concerns about the side effects. She didn't say about the benefits of the medication. That was probably my fault that I didn't ask her about that. But she was emphasizing to the court why she didn't want to take the medication. So the comment was that her declaration of side effects was basically she read the information that she had been actively drugged and basically adopted all the side effects and that was her credibility. Is that your interpretation of what happened in trial? Do you disagree with that? Because in the petition, the doctor mentions that she did have issues with constipation and gastrointestinal effects. The doctor initially stated that, oh, she never talked to me about the side effects before. And then I got the doctor to clarify later on. I said, well, in the petition, you mentioned that she mentioned to her the side effects. And she said, oh, I forgot about that. And then she clarified. So she did notify it to the doctor beforehand. Remind me, what was her area of practice? She was a DO, so a general practitioner. She did testify she went to continuing medical education about mental illness, too. And her license was suspended in 2004. So I think in this case, it's a little bit different than usual. I think the doctor needed to provide – I think the state's trying to shift the burden about capacity to the respondent when it's really the state's burden to prove that the respondent lacks capacity. And just saying that she has delusions, which was her second part, because she doesn't believe she has delusions doesn't mean that she lacks the capacity. I think that stretches this issue a little far. The other issue that we have is regarding whether her behavior satisfies the criteria for involuntary medication. I apologize. And as you well know, under the Illinois and U.S. Supreme Court, for involuntary medication, the client must have behavior that endangers the health of – health of self or others. And, of course, endangering self is endangering your own health, too. So that's the basis. It has to be that basic for the involuntary medication. So here, with – regarding the deterioration of bilia function, there was clear evidence she was in good physical health. She was eating, sleeping properly. The main thing was that she was harassing others and having delusions. And I don't think – if you look at the court cases and the precedent with deterioration of bilia function, the harassing others and having delusions is really not sufficient. It's not to the level of where it should be for involuntary medication. The ones where it is, like, more harassing is when they came and participate in court where they're, you know, ejected or they can't speak coherently. You know, she spoke rambly, but you could understand what she was saying, I think. And also, I mean, we regret that she had a loss of her job status and her overall status, but that's not sufficient enough to do involuntary medication, especially with deterioration of function. That's usually basic functioning, eating, sleeping. Your physical health is endangered. I think having delusions alone is not sufficient, and her harassing others in the hospital, Malou, is more under the issue of patient control than her endangering herself. With regarding to the threatened behavior, I'm kind of replicating my argument here that it was, she was probably, just to be honest, pain in the neck with the hospital staff, but it was not to the effect where she would hit anyone or the most egregious was she threw a book at one staff person, but that was, I don't think that's severely endangering people sufficient. It's not sufficient clear and convincing evidence for involuntary medication. Wasn't there a suggestion that, I think both sides are suggesting that it was a different scenario, but did your client threaten to cut a male staff member? Right, but that was three months before the hearing, so then begins the issue whether it's current. I mean, they received, to be honest with the, okay, with the threatened behavior, she had no tools to carry it out. So was it, you know, there's a good fourth district case, is threatened behavior really threatening when that person has no means to carry it out there? She's not going to get a knife, not going to get scissors in the hospital setting, you know, hopefully. And so, you know, the thing is, is that true threatening behavior when the staff person, I mean, the practicality of it actually being realized is very minimum. And then the other issue is that most of those events, oh, I'm sorry. Yeah, and then also the issue of suffering is a key, actually a critical one, so I'll reserve that argument for later. Thank you. Thank you, Counsel. Counsel? May it please the Court. Counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. After Respondent filed her opening brief, this Court decided in Ray Deborah Bee, and I think in addressing the first issue about written information, we have to talk about Deborah Bee. I think that I would respectfully ask this Court to reconsider Deborah Bee, considering statutory interpretation, which was not considered in Deborah Bee, and I want you to look at a comma. The statute says, if a psychiatrist recommends the involuntary administration of psychotropic medication, she shall advise the recipient in writing of the side effects, risks, and benefits of the treatment, comma, as well as the alternatives to the proposed treatment. It doesn't say that she shall advise the recipient in reading of the side effects, risks, benefits of the treatment, and alternatives to proposed treatment. So the doctor must advise the recipient of alternatives to the proposed treatment, but unless that comma means nothing, then the alternatives don't have to be in writing. And I'm not saying that alternatives to medication are not treatment or services. I'm just questioning whether the written information is for the proposed treatment or the alternatives. In any case, in this particular case, there was no proposed non-medical treatment. Dr. Mahmood proposed Risperidone, Depakote, Ativan, and Risperidol-Consta. He talked about if Risperidone didn't work, then he was going to give Olanzapine. If Depakote wasn't effective, he was going to give Topamax. He gave written information about the side effects of all of those. But the record also reflects that non-medical forms of treatment had already been explored and attempted without any sign of improvement. So they weren't considered as alternatives to the proposed treatment. And in N. Ray, Laura H., the court said that only if non-medication treatment alternatives were appropriate for the respondent should written information also have included non-medical forms of treatment. Well, they weren't appropriate, and that's in the record. I think you need to tell the patient about what they're going to get. I mean, I don't know a lot about it. I can't give a big list of psychotropic medications, but let's just say Xanax. I think it is a psychotropic medication. Nobody ever talked about giving this woman Xanax. Did they have to tell her about the side effects of Xanax? No, because it was not a proposed treatment. Non-medical forms of treatment for this patient were not a proposed part of her treatment. So the other cases in Deborah B., the doctor didn't. The case says that he did not testify that he discussed with Deborah B. or provided her with any written information regarding alternative medications. So there was no information in the record, no information in that record, to allow the court to conclude that Deborah B. had been provided with the information. Here, it's very different. He stated that non-medical forms of treatment had already been explored. If you look at the other cases cited in respondents' reply brief, Tiffany W., Bobby F., Nicholas L., Tiffany W. doesn't indicate whether there were any alternatives. Bobby F. was presented only with a written list of all the side effects, and he received nothing about the risks, benefits, or alternatives. Nicholas L. apparently received written notification of the risks and benefits of the two requested drugs, but there was no evidence that he was advised in writing of the alternative treatments. So that's my request to have this court reconsider Deborah B. and I will move on to briefly touch on the other things raised in this brief. As far as the capacity of the respondent to understand the advantages and disadvantages, the respondent claims that a treating physician's statement, both in the reply brief and before this court, that when a treating physician's statement that her patient cannot be reasoned with is akin to stating that the patient lacks capacity because she disagrees with the doctor. That's not what the state said. The state cannot be reasoned with does not mean disagrees with. Someone who can't be reasoned with doesn't even listen to the reasoning set forth. It has nothing to do with agreeing or disagreeing. We've all dealt with our children and grandchildren and you say, don't put your hand in the fire, it will burn you. And if the child refuses to listen and does it anyway, that child can't be reasoned with. It doesn't mean they disagree with whether or not the fire will burn them, you just can't reason with them. I can reason with this court and you can agree with me or you can disagree with me. There's a big distinction between disagreeing with someone and being able to reason with them. I think I've addressed in my brief the fact that I do want to mention one thing. Council for Respondent talked about the Israel factors. In the opening brief, factor six is the absence of interfering pathological perceptions or beliefs or interfering emotional states that might prevent an understanding of the legitimate risks in briefs. And in the opening brief, respondents stated, the state also presented evidence about Dr. Mary H's alleged delusions, which could satisfy the sixth Israel factor. That's on page 23 of Respondent's opening brief. But in her reply brief, she changes strides and says that the state didn't satisfy the sixth Israel factor. And I don't think Respondent can have it both ways. So I think what it really comes down to is we're only dealing with two Israel factors. Number two, the person's ability to understand the available options and the advantages and disadvantages. And number five, if the person has received a similar treatment in the past, whether he or she can describe what happened as a result and how the effects were beneficial or harmful. And these kind of deal with similar facts. So this is overstated. As you pointed out, she could tell you all the side effects, the bad things, everything that went wrong. But she was literally reading them from the pamphlet. And she didn't mention one single thing about how they could help. I don't think that shows that she was able to understand the options and the advantages and disadvantages. Just simply reading. I mean, we all know the television commercials for any medication, where they tell you the wonderful things that will happen if you take this medication. And then they hire somebody who can talk faster than anybody I've ever met in my life to say, it can cause this. And if you just read that, no one would take that medication. So if you just look at the disadvantages and don't look at the benefits and side effects, then you can't possibly make a reasoned decision. Running out of time, I just want to say one thing about her ability or her deterioration of function. Suffering. This woman, counsel says she thought she'd been involved in a crime. This woman thinks every man she meets has raped her. Rape is the most personal of crimes to a woman. And to say that a woman who thinks that that man taking care of her,  and that male doctor, I mean, I'm not saying these are the absolute facts of this case, but just, and it certainly was the orderlies, that she thought had raped her. That woman's suffering. Any questions? Thank you. Thank you. Counsel? Good morning. Just a couple points. With regarding the written information, the state would like to almost add language to the statute saying appropriate alternative forms of treatment. But the statute says alternative forms of treatment. She would like the doctor to say, well, it was counseling and psychotherapy didn't work, so you don't have to give the information to it. That would actually water it down and would let the doctor decide, oh, well, since counseling and psychotherapy didn't work, we don't have to provide that written information. There's a clear case, Tiffany W., where it's just the written information about non-medical treatment options were not provided, and they were clear that it requires reversal. With regard to the issue of suffering, and I didn't address this beforehand, and I want to say that it's almost like the Philip E. case. It probably did exist, but the state didn't prove it. And this is an interesting case because Rouge's suffering, and Deborah B., I argued that they had to be physical manifestations, which this court kind of refined and said you don't have to have physical manifestations. It's physical or it could be emotional damage. So here there's very little physical manifestations. Her physical health was fine. So then you have to see whether her suffering affected her emotional health or emotional mental health. And we're getting into the area of her beliefs, which a person has a strong First Amendment right to your beliefs and to what you believe. So here the state's witness did not do the nexus between why her beliefs would cause emotional damage to her or danger to herself. I mean we could conclude, we could do a logical leap that the anguish would be harmful to her, but here we're involuntarily medicating someone for their beliefs. And I think the state has to have that extra, for clear and convincing evidence, there has to be that proof that why do those beliefs or her delusions, i.e., why would that cause suffering sufficient enough to emotionally damage her or danger to herself emotionally. I know I'm being very complex and nuanced here, but I think because we're getting into the area of what beliefs can constitute involuntary medication, and I think we have to be very refined on this. Just as a practical matter, this court issued Debra B., and actually litigators are loving it because there were so few areas of case law with regard to this issue of suffering. And because suffering is so hard to figure out, there's been no case precedent that affirms just on the issue of suffering alone. And so it was usually deterioration of ability to function or threatening behavior, because I think you're getting into the area of the person's, it's very nebulous. I've had clients who cry all the time, that's why I emphasize the physical, because cry or not eat because of their thing, that's obvious suffering. But when you're getting into your belief system at English, I think the state, which they failed to do here, and may have existed, but they failed to offer that nexus of why her beliefs caused her emotional damage. So thank you for your time. I know this is a complex area, especially on the issue of the suffering, but we appreciate your time with this. Thank you. Thank you. We appreciate your briefs and arguments. Counsel will take the case under advisement, issue an order, and close. Thank you.